ROBERT E. BRONSON, III, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bronson v. Commissioner
Docket No. 34645-87
United States Tax Court
T.C. Memo 1992-122; 1992 Tax Ct. Memo LEXIS 145; 63 T.C.M. (CCH) 2225; T.C.M. (RIA) 92122; March 2, 1992, Filed *145 Decision will be entered under Rule 155. Robert E. Bronson, III, pro se. William S. Garofalo, Brendan G. King, and James Gehres, for respondent. SCOTT SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's Federal income tax and additions to tax for the calendar years 1979 through 1983 in the following amounts: Additions to Tax
Year
Deficiency
Sec.6651(a)(1)
Sec.6653(a)
Sec. 6653(a)(1)
Sec.6654
1979
$ 83,512
$ 20,878
$ 4,176
$ --  $ 3,493
1980
70,573
17,643
3,529
--  4,497
1981
62,568
15,642
--  3,128
4,795
1982
47,474
11,868
--  2,374
4,623
1983
12,179
3,045
--  609
747
Additions to Tax
Year
Sec.6661
1979
$ --  1980
--  1981
--  1982
11,869
1983
3,045
For returns for 1981, 1982, and 1983 respondent determined that the addition to tax equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence pursuant to section 6653(a)(2) [1] was applicable. By an amendment to his answer, respondent alleged that petitioner was liable for an addition to tax under section 6659(a) in each of the years in *146 issue for underpayment of tax attributable to a valuation overstatement and an increased rate of interest for each year in issue on underpayments attributable to tax-motivated transactions pursuant to section 6621(c). Some of the issues raised by the pleadings have been disposed of by agreement of the parties leaving for decision the following: (1) Whether petitioner is entitled to depreciation and miscellaneous deductions and investment tax credit with respect to art masters he purchased from Jackie Fine Arts, Inc.; (2) whether petitioner is entitled to deductions of losses claimed from either or both Resortimeshare Marketing Associates, Ltd., or Resortimeshare Development Associates, Ltd. II, and if so, the amount of losses deductible; (3) whether petitioner is liable for an addition to tax pursuant to section 6659(a) *147 for all years in issue for underpayment of tax attributable to valuation overstatement; (4) whether petitioner is subject to an increased rate of interest for interest accrued after December 31, 1984, on underpayments attributable to tax-motivated transactions pursuant to section 6621(c) for the years in issue; (5) whether petitioner is liable for an addition to tax pursuant to section 6661(a) for substantial understatement of income tax for the years 1982 and 1983; (6) whether petitioner is liable for an addition to tax pursuant to section 6651(a)(1) for failing to timely file a Federal income tax return for any or all of the years here in issue; (7) whether petitioner is liable for an addition to tax pursuant to section 6653(a) for negligence or intentional disregard of rules and regulations for the years 1979 and 1980 and under section 6653(a)(1) and (2) for the years 1981, 1982, and 1983; and (8) whether petitioner is liable for an addition to tax pursuant to section 6654(a) for underpayment of estimated tax for each of the years here in issue. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner resided in Littleton, Colorado, on the *148 date of the filing of the petition in this case. Petitioner attended the U.S. Military Academy at West Point, New York, in 1962 and the University of Washington in Seattle, Washington, from 1963 through 1966, but did not obtain a degree. He majored in mathematics and philosophy. From 1967 through 1980 petitioner's primary occupation was financial planning. In 1977 petitioner and his wife obtained an interest in a custom framing shop, Chatfield Frameworks and Gallery (Chatfield Frameworks), which had been started a few months earlier by another couple. Initially the business of Chatfield Frameworks was that of a custom framer, but later art work was sold by the business. From 1979 through 1983, the distributive share of income from Chatfield Frameworks allocable to petitioner and his wife was as follows: Year
Total income
1979
$ 6,690.00
1980
9,404.00
1981
7,152.00
1982
5,788.00
1983
8,403.14
Jackie Fine Arts, Inc. (Jackie), is a corporation that sold art masters. Mr. Herman Finesod was president of Jackie. Art Resources and Treasures (ART) in which Mr. Herman Finesod had an interest also sold art masters. Jackie sold approximately 2,500 and ART sold approximately *149 400 art masters from 1977 through 1981. An art master consists of a metal, mylar, or etching plate from which prints can be made. If the prints are modeled after some other work, such as an oil painting, the painting or other work from which the plate is modeled is not included as part of the art master. Jackie sold the copyright and other marketing and production rights for the image as part of the art master sale. These rights entitled the purchaser to use the image for posters or other ancillary products, such as greeting cards, tapestries, and napkins. Jackie would also arrange for the printing of a limited edition as part of the art master package, but charged an additional fee for this service. Alternatively, investors who purchased the art masters could arrange for or contract out the printing. The limited edition prints were signed by the artist by hand. In 1977 and 1978 Jackie sold its art masters for cash, promissory notes secured by letters of credit, and long-term nonrecourse notes. In 1979 Jackie amended its contracts to provide for recourse liability on some or all of the principal of the long-term notes. Some contracts contained an inventory turnback provision *150 which allowed investors to turn back inventory or ancillary products produced by them in payment of their recourse liabilities. In 1978 petitioner began selling Jackie art masters for Financial Strategies Company (Financial). Petitioner and Financial would invite tax professionals to a presentation by Jackie as an aid in selling the art masters. Each of the tax professionals would receive a Jackie information memorandum and an illustration of tax consequences for himself and for his clients, the art investors. Both the information memorandum and illustration of tax consequences focus on tax benefits and highlight the fact that the Jackie program could be expected to produce writeoffs averaging $ 4 tax "write-off" dollars to $ 1 invested in the year of acquisition. Petitioner and Financial would follow up on the result of the presentation and solicitation to accountants and attorneys and schedule a meeting to make a further presentation of the package or to present the package to the accountants' or attorneys' clients. The commissions paid to petitioner and Financial by Jackie were based solely on the cash (including short-term notes) required by the investor contracts they sold. *151 The amount of commissions was unaffected by the overall purchase price or amount of long-term notes (whether recourse or nonrecourse). Petitioner sold three or four Jackie art masters in 1978 to investors, and by 1981 had sold 30 to 35. As a salesman of the Jackie art, petitioner would receive a discount on the initial cash payment for his purchase of any art master. However, the deferred amount of the note would be increased by the exact amount of the discount received on the cash payment for the purchase, resulting in the same overall purchase price for the art master. In 1978, petitioner and Mr. Edward Koplin as equal partners began Artvest, Ltd. (Artvest). Artvest brought five artists to Jackie so that Jackie could negotiate purchases of plates from them for use in the Jackie art master program. Each of the five artists sold art masters to Jackie. One of the five was Mr. Roy Purcell. In return for bringing the artist to Jackie, Artvest received artist proofs of limited edition prints for the art master from the artists. The proofs could not be sold until the limited edition was sold out. Petitioner also received a discount on the cash payment for any purchase of an *152 art master from one of the five artists. However, the deferred note on such a purchase was increased by the amount of the cash discount, so that the overall price would remain the same. On December 30, 1978, petitioner purchased the art master "Dead Giveaway" by Mr. William Schwedler from Jackie. Mr. Schwedler is an abstract artist to some extent known in New York and San Francisco, but with a minimal following in the Midwest. Mr. Schwedler died in 1985. The initial version of the contract was signed by petitioner both as purchaser and as sales representative of Jackie. The total purchase price of the art master was $ 280,000, composed of $ 279,000 for the art master and $ 1,000 for the copyright. The contract also included a charge of $ 3,000 for the production of limited edition prints from the art master. The $ 280,000 total purchase price and $ 3,000 production cost was to be paid with a $ 5,500 short-term note due on June 1, 1979, a $ 2,500 short-term note due December 31, 1979, and a $ 275,000 long-term note, with interest due on the unpaid principal at the rate of 6 percent per annum, due January 15, 1989. The long-term note contains a blank space where an amount for *153 which petitioner would be personally liable could have been inserted. A slightly revised contract for the purchase of Dead Giveaway also dated December 30, 1978, was later executed by petitioner and Mr. Finesod. The total purchase price remained $ 280,000 and the cost of production of the limited edition remained $ 3,000. The $ 280,000 was composed of $ 5,000 cash and a $ 275,000 nonrecourse note. The initial run of Dead Giveaway was damaged by water. The edition was later reprinted, but by that time Mr. Schwedler was quite ill. Petitioner had Mr. Schwedler sign the limited edition prints while he was in the hospital, a few at a time, until Mr. Schwedler no longer was able to sign. High Country Images, Ltd. (High Country), was a partnership owned 75 percent by petitioner and 25 percent by Mr. Koplin. On December 22, 1979, High Country purchased the art master "Rocky Mountain Freighter" (Freighter) by Mr. Purcell from Jackie. Mr. Purcell's work deals mostly with western themes. He does not have a national reputation as an artist but is known in some localities. The total purchase price of the art master was $ 315,000, composed of $ 314,000 for the art master and $ 1,000 *154 for the copyright. The $ 315,000 total purchase price was to be paid $ 1,950 in cash at closing and $ 313,050 by a long-term note, with interest due on the unpaid principal at the rate of 6 percent per annum, due January 15, 1991. This note initially was stated to be recourse in the amount of $ 30,803 and nonrecourse in the amount of $ 282,247. Although the cost of production of the limited edition was set at $ 1,500 for 250 prints, no amount was allocated as payment for such cost. High Country purchased a second art master, "Dreams of El Dorado I and II" (Dreams of El Dorado), also by Mr. Purcell, on December 28, 1980. The total purchase price of the art master was $ 265,000, composed of $ 264,000 for the art master and $ 1,000 for the copyright. The $ 265,000 total purchase price was to be paid $ 5,000 in cash at closing and $ 260,000 by a long-term note, with interest due on the unpaid principal at the rate of 9 percent per annum, due January 15, 1994. This note initially was stated to be recourse in the amount of $ 91,000 and nonrecourse in the amount of $ 169,000. Dreams of El Dorado is a diptych, which consists of two prints, which when placed together form one continuous *155 scene. The contract for Freighter contained a provision allowing for turnback of inventory or collateral to pay off the recourse notes. The value of the inventory or collateral would first be applied to reduce the recourse liabilities and then to reduce the nonrecourse liabilities. Petitioner was entitled to turn back inventory at 50 percent of the "fair market value" up to the amount of the notes. Fair market value was defined as equaling the average of the last five bona fide sales of each inventory product in the last 3 years. The contract for Dreams of El Dorado contained a provision allowing for turnback of the inventory at 50 percent of the appraised fair market value. In general, appraised fair market value was defined as the average of two values determined by appraisal of the collateral disposed of at the wholesale level on a commercially reasonable basis. Under the contract for each art master, Jackie was entitled to 50 percent of the net receipts earned by petitioner until the long-term notes were paid. Petitioner expected that he would be able to avoid liability on the notes by turning back inventory in payment of the entire amount of the notes even if not many *156 of the limited edition prints were sold. The contract for Dead Giveaway did not contain a turnback provision. Petitioner or High Country received appraisals of the art masters from Mr. Sigmund Rothschild (Rothschild) and Mr. F. Peter Rose (Rose) with respect to the three art masters purchased. These appraisers valued the art masters as follows: Art master
Rothschild appraisal
Rose Appraisal
Dead Giveaway
$ 320,000
[not in evidence]
Freighter
350,000
$ 335,000     Dreams of Eldorado
310,000
305,000     The appraisals are all dated after the sale of the art master being appraised. Mr. Rothschild's appraisal of Freighter contains a projection of possible sales from the art master. The projection was that petitioner would receive $ 90,000 in sales from the limited edition and $ 1,431,000 in sales from posters and other ancillary products, and net wholesale income of $ 422,800. Jackie would routinely forgive the recourse liabilities in the contracts if the investors returned the art master and limited edition prints. No attempt would be made to verify whether the collateral fair market value as determined under the contracts was equal to the outstanding notes. *157 Petitioner received such an offer. The original amounts of recourse liability for the art master contracts in 1979 and 1980 were calculated by Jackie to equal exactly a taxpayer's need for at-risk amounts under section 465 to permit deduction of all claimed depreciation and interest for 2 years. Petitioner was aware that the recourse amounts were determined by the amount needed to be at risk for purposes of section 465. In 1980 petitioner agreed to increases in the recourse liabilities on his notes. For Dead Giveaway, the recourse liability on the long-term note was increased from $ 0 to $ 60,000. For Freighter, the recourse liability was increased from $ 30,803 to $ 111,413. Both increases in recourse liability were agreed to by petitioner for no consideration. Mr. Koplin owned a marketing and distribution company named Authenticated Graphic Editions Internationale, Ltd. (AGE). AGE was primarily a wholesaler, although Mr. Koplin did own a retail gallery in Denver. Petitioner signed contracts with AGE for AGE to be the exclusive distributor of the art masters. The contracts called for a $ 500 initial marketing fee and an additional $ 2,500 when the plates or limited editions *158 were received and both amounts were to be used for marketing the art masters. The marketing contracts also called for 40 percent of gross receipts to be paid as commission on sales, and as further consideration, 10 percent of gross receipts on sales other than the limited editions. AGE sold nine Freighter prints from 1980 to 1982 for a total of $ 1,430 and three Dreams of El Dorado prints in 1982 for a total of $ 480. AGE did not make any sales from 1983 to 1989. Mr. Purcell was paid $ 3,000 in cash and a $ 165,000 nonrecourse note for each of his art masters. He was also paid $ 4,500 for printing. He eventually sold Jackie 16 art masters, each with 250 limited edition prints. Mr. Purcell never received any payments on his nonrecourse notes. Mr. Purcell retained 30 artist proofs for each art master he sold to Jackie. He sold approximately 15 of his 30 proofs of Freighter over 10 years, and he sold all his proofs of Dreams of El Dorado, with his last sale being in 1990 for approximately twice what he sold a proof for in 1980. Mr. Purcell has printed many editions over the years, although most were smaller in number than the Jackie editions. An artist generally has an established *159 clientele and for this reason it is easier for him to sell his prints than it is for an investor to sell them. Petitioner's income tax returns for 1980 through 1982 claim depreciation deductions for Jackie art masters as follows: Depreciation in Art Master
Basis 1980
1981 1982 Dead Giveaway
$ 65,000
$ 10,543
$ 8,200
$ 7,222
Freighter
86,147
18,113
15,094
12,578
El Dorado
72,000
8,000
14,333
11,944
The 1980 through 1982 returns also claim unidentified investment credits, which appear to be carried over from 1979. An unsigned Form 1040 for 1979 sent by petitioners to the Internal Revenue Service (IRS) claims a $ 140,000 basis in Dead Giveaway, $ 27,259 in depreciation, a loss of $ 14,340 from the High Country partnership, and claims an investment tax credit of $ 3,090 which is not identified. The income tax return for 1979 filed by petitioner, which was filed in 1989, does not show a basis claimed for any Jackie art masters. Petitioner was the sole shareholder and president of Resort Timeshare Management Company, Inc. (Management). Management was formed pursuant to the laws of the State of Delaware and was a subchapter S corporation. Resort *160 Timeshare Marketing Associates, Ltd. (Marketing), was an accrual basis, calendar year, limited partnership formed pursuant to the laws of the State of Colorado on December 4, 1980. It was organized to engage in the development and marketing of timeshare intervals and in connection therewith to acquire, invest in, own, maintain, and improve real property and to create and market timeshare intervals therein. Management was the sole general partner of Marketing. In 1980 Management contributed $ 5,758 to the capital of Marketing and had a 1-percent interest in its profits, losses, and capital, and in 1981 Management contributed an additional $ 4,545 to marketing but still had only a 1-percent interest in its profits, losses, and capital. Management made no contribution to the capital of Marketing in 1982, and Management's 1-percent interest in Marketing remained unchanged. Petitioner was the initial limited partner at the formation of Marketing. Pursuant to the limited partnership agreement, he was to withdraw as limited partner concurrently with the recordation of an amended Certificate which admitted additional limited partners. No Schedule K-1 was issued for petitioner with *161 respect to Marketing during 1980, 1981, or 1982. International Vacation Resorts, Inc. (IVR), is a corporation organized in November 1980 pursuant to the laws of the State of Colorado. IVR engaged in the business of locating, creating, and marketing condominium timesharing interval units and other forms of ownership in various resort properties. Petitioner owned one-third of its stock. The remaining two-thirds was held in equal proportion by Mr. William Prime and Mr. Paul Bedell, or a corporation controlled by Mr. Paul Bedell. Petitioner was on the board of directors of IVR. On December 4, 1980, Marketing and IVR entered into an agreement entitled "Timeshare Marketing Agreement" (agreement). The agreement was executed by petitioner as president of Marketing's general partner, Management, and by Mr. Paul Bedell as president of IVR. Marketing appointed IVR as its marketing agent and granted IVR the exclusive right during the term of the agreement to distribute and sell resort timesharing intervals in all real property acquired by Marketing. Marketing agreed to pay IVR a nonrefundable "minimum annual marketing fee" in an amount equal to 125 percent of the total initial capital *162 contributions of the limited partners. The fee was payable on the execution of the agreement and on the anniversary date of each year during the term of the agreement. The fees paid were to be treated as advances of the commissions which would become payable to IVR in the amount of 50 percent of the gross retail sales price of whatever timeshare units it sold. The fee payments required could be deferred at the sole discretion of the general partner, conditioned upon assumption of personal liability by the limited partners. The agreement was amended on March 30, 1981. Under the amended agreement, Marketing was obligated to pay IVR a nonrefundable minimum annual marketing fee of $ 712,500 plus an amount equal to two times the initial capital contributions of additional limited partners admitted to Marketing in 1981. The fee was due and payable to IVR whether or not Marketing was successful in acquiring resort properties to be used for timesharing. The amended agreement also contained a deferral provision. As of December 31, 1980, Marketing had acquired no assets that could be marketed as timeshare units. At the end of the 1981 taxable year, Marketing had acquired, for $ 225,000, *163 an option to purchase from IVR the Old Adobe Resort property in Tucson, Arizona. The Old Adobe Resort was encumbered by liabilities at the time Marketing acquired an option to purchase it. The partnership return of income for its 1982 taxable year shows under the caption "Property Acquisition Old Adobe" the amount of $ 307,947. Marketing did not acquire any ownership interests other than its interest in Old Adobe Resort. On its partnership returns of income, Marketing deducted accrued marketing fees as follows: Taxable period Amount reported on return
December 30 to 31, 1980
$ 712,500  1981
1,612,500
1982
1,612,500
Total            $ 3,937,500
Marketing also claimed a deduction for management fees in the amounts of $ 36,000 for 1981 and $ 39,000 for 1982. No partnership returns of income were filed for Marketing for the years ending after December 31, 1982. Resortimeshare Development Associates, Ltd. II (Development), was an accrual basis, calendar year, limited partnership formed pursuant to the laws of the State of Colorado. On its Form 1065 filed for the year 1981, it is stated that the return is for the year beginning December 30, 1981, and ending December *164 31, 1981. Under the space provided for "Date business started" appears "Oct 19, 1981," the "1981" typewritten and the "Oct 19" in handwriting. Development was organized to engage in the development and marketing of timeshare intervals and in connection therewith to acquire, invest in, own, maintain, and improve real property and to create and market timeshare intervals therein. Management was the sole general partner of Development. In 1981 Management contributed $ 10,354 to the capital of Development. On the Schedule K-1 for Management attached to Development's Form 1065, U.S. Partnership Return of Income for 1981, Management is shown as having a 2-percent interest in losses and a 1-percent ownership interest in capital. In 1982 Management made no additional contributions of capital to Development. On its Schedule K-1 for that year, its interest in Development remained unchanged. Petitioner was a limited partner in Development. During 1981 he contributed $ 10,000 to the capital of Development. The Schedule K-1 for petitioner attached to Development's return of income for 1981 shows that he had a 1.86371-percent interest in losses and a 0.9659-percent ownership interest *165 in capital. During 1982 petitioner made no additional contributions of capital to Development. His Schedule K-1 for 1982 shows that his interest in Development remained unchanged. A document entitled "Timeshare Marketing Agreement" is attached to the Private Placement Memorandum of Development. This document is similar to the Timeshare Marketing Agreement executed by IVR and Marketing. The document states that it was to be entered into on December 30, 1981, between IVR and Development. Pursuant to the document, Development was to appoint IVR as its marketing agent and grant IVR the exclusive right during the term of the agreement to distribute and sell resort timeshare intervals in all real property acquired by Development. Development was to agree to pay IVR a nonrefundable "minimum annual marketing fee" in an amount equal to 100 percent of the total initial capital contributions of the limited partners to the partnership. The fee was payable on the execution of the agreement and on the anniversary date of each year during the term of the agreement. The fee payments required could be deferred in the sole discretion of the general partner. The aggregate amount of outstanding *166 and unpaid amounts deferred could not exceed at any one time the sum of 300 percent of the limited partners' initial capital contributions to Development, and all amounts were due and payable upon the date of termination of the agreement, but in no event later than 10 years from the date of the agreement. Payment of the fee due December 31, 1981, amounting to $ 1,025,000, was deferred. As additional compensation, the agreement provided that Development would pay IVR a commission equal to 50 percent of the net timeshare revenues received from the sale of timeshare units in partnership properties. Development could, in the sole discretion of the general partner, designate a portion of any marketing commission payable to IVR as payment of all or a portion of the minimum annual marketing fee, whether or not the fee had been deferred, and the commission due would be reduced by the amounts so designated. As of December 31, 1981, Development had acquired no assets that could be marketed as timeshare units. At the end of the 1982 taxable year, Development had acquired an option on a boat named White Peppa for $ 17,090, a creditor interest of $ 1,005,000 in a boat named Romance, and made *167 a $ 120,623 downpayment on a boat to be built named Skipperliner. No ownership interests were ever acquired by Development other than the option, creditor, or downpayment interests in the three boats. On its partnership returns of income for 1981 and 1982, Development deducted accrued marketing fees as follows: Taxable period
Amount reported on return
December 30 to 31, 1981
$ 1,025,000
1982
1,025,000
Total            $ 2,050,000
Development on its return of income for 1982 also claimed a deduction for management fees paid to Management in the amount of $ 27,000. No partnership returns of income were filed for Development for the years ending after December 31, 1982. On August 16, 1983, petitioner filed voluntary petitions in bankruptcy in the United States District Court for the District of Colorado on behalf of Management, Marketing, and Development. IVR was dissolved under Colorado law in January 1988. Petitioner did not timely file his returns for any of the years 1979 through 1983. On September 25, 1981, petitioner was contacted by an employee of the IRS in Ogden, Utah, with respect to his failure to file a return for 1979. On October 5, 1981, petitioner *168 responded by stating that his net earnings from self-employment were less than $ 400. Petitioner was informed by a letter dated November 27, 1981, from the IRS at Ogden, Utah, that the records available to the IRS indicated that he had income of approximately $ 103,000 under the name of Financial Strategy (sic) Company. A series of correspondence between petitioner and the IRS at Ogden ensued until April 28, 1983. Petitioner was requested to file his return for 1979. In 1982 petitioner submitted an unsigned Form 1040 for the calendar year 1979 to the IRS. The unsigned Form 1040 stated that petitioner had taxable income of $ 54,899.36. However, the resulting tax was eliminated by claimed investment tax credits. On December 28, 1987, petitioner filed a joint income tax return with his wife for 1983. On April 17, 1989, petitioner filed joint returns with his wife for each of the calendar years 1979, 1980, 1981, and 1982. On his returns for each of these years, petitioner claimed deductions relating to Jackie art masters. On his returns for each of the years 1980, 1981, 1982, and 1983, petitioner claimed loss deductions with respect to Management and on his 1981 and 1982 returns *169 claimed loss deductions with respect to Development. Respondent, in his notice of deficiency to petitioner dated July 20, 1987, determined petitioner's taxable income on the basis of bank records and financial information received during the audit. The notice stated that since petitioner had filed no returns for any of the years 1979 through 1983, his taxable income was increased by the total amount respondent had determined as his income for each of the years in issue. The parties have agreed to all items involved in determining petitioner's tax liability except whether he is entitled to deductions for depreciation and other miscellaneous deductions and investment tax credits with respect to his purchase of art masters from Jackie and whether petitioner is entitled to deduct losses from Marketing and Development, and if so, the amount of the deductions. The additions to tax and increased interest determined by respondent in the notice of deficiency and as claimed by respondent in his amendment to answer are also still in issue. OPINION Respondent contends that petitioner's claimed losses from Jackie should be disregarded as a tax-avoidance device, not motivated by legitimate *170 business purposes and totally devoid of economic substance. Petitioner contends that his purchase of the Jackie art masters was to make a profit and not solely for tax avoidance. In Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989), which also involved claimed losses from acquisitions from Jackie, this Court found the acquisitions of art master purchases from Jackie to be a generic tax shelter. A generic tax shelter was stated to encompass the following factors: (1) Tax benefits were the focus of promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance. * * * [88 T.C. at 412.]
The stipulation, exhibits, and testimony in this case *171 establish that petitioner's transactions with Jackie are indistinguishable from those entered into by the taxpayers in Rose v. Commissioner, supra, and other taxpayers participating in the Jackie art masters program. [2]
In affirming our holding in Rose v. Commissioner, supra, the Court of Appeals for the Sixth Circuit stated that it was not necessary to place the label "generic tax shelter" on the transaction involved since clearly the record supported, and this Court had found, that the transaction had no business purpose, and that the only purpose of the transaction was to obtain the tax benefits. Rose v. Commissioner, 868 F.2d 851, 853 (6th Cir. 1989), affg. 88 T.C. 386 (1987). The *172 same is true in this case. See also Karr v. Commissioner, 924 F.2d 1018, 1023 (11th Cir. 1991), affg. 91 T.C. 733 (1988). Petitioner argues that since he had a picture framing business and sold some prints on the premises, his situation is distinguishable from that in Rose v. Commissioner, supra, and other cases following the Rose case. The facts do not support this contention. The art masters purchased from Jackie were not shown to be any part of the picture framing business in which petitioner had an interest. Petitioner's handling of the Jackie art master purchases as a tax avoidance device was the same as that of other purchasers of Jackie art masters. In fact petitioner was a salesman for Jackie and stressed the tax benefits of the transactions to his customers. The Jackie promotional materials emphasized the tax benefits associated with the purchase of art masters. Every prospective purchaser and his tax adviser would receive an illustration setting forth in detail the expected tax consequences of the investment. The illustration would highlight the expected write off, which varied over the period 1977 to 1980 from $ 3.5 *173 to $ 4.5 tax "write-off" dollars to $ 1 invested for the initial years of investment. Illustration of tax consequences was also in the offering memorandum and in the image books, which contained slides of the various images an investor could select for his purchase. The offering memorandum was provided to all investors and their tax advisers. The focus was on the tax aspects of the transactions. Jackie even secured tax representation for investors. Petitioner, as a salesman for Jackie, marketed solely through tax advisers and accountants. Petitioner argues that he progressively negotiated substantially better terms for the three art masters. Specifically, he argues that he negotiated for "a non-standard recourse note, five years extension of balloon due dates, narrower definition of net receipts prepayment conditions, reversion of the risks of sales, use, inventory, personal property and occupancy taxes back to the syndicator, and various other contractual conditions uniquely favorable to Petitioner". Petitioner has failed to establish that he in fact did negotiate the above items or show that they were in fact better or different from what other participants received. By *174 looking at the art master purchases, it appears that petitioner accepted the terms of the purchase without price negotiation: Art Master
Total Price
Cash Other
Dead Giveaway
$ 280,000
$ 5,000
$ 275,000
Freighter
315,000
1,950
313,050
Dreams of El Dorado
265,000
5,000
260,000
This is further evidence by the fact that, as a salesman and as the person who brought artists to Jackie, petitioner received a discount on the initial amount of cash due on a purchase, but the amount of the discount was always added back to the amount of the long-term notes so that the overall price remained the same. Petitioner through High Country purchased the Purcell art masters for $ 315,000 and $ 265,000. Jackie bought the art masters from Mr. Purcell for $ 168,000. Most of the amounts paid to Mr. Purcell were by nonrecourse notes, none of which were ever paid. Mr. Purcell testified that he would have sold the art masters for $ 20,000. Petitioner introduced Mr. Purcell to Jackie. Petitioner offers no persuasive reason why he would choose to purchase the art masters at the increased price from Jackie. Finally, without even considering if the notes labeled as recourse are to *175 be treated as recourse notes, the bulk of the transaction clearly consisted of nonrecourse liability. Respondent argues that the dealings between petitioner and the promoter were unbusinesslike and not at arm's length. Persuasive evidence of the lack of arm's-length price negotiation is petitioner's blind acceptance of the exaggerated values of the images asked by Jackie. The initial contracts call for little or no amount of the purchase price note to be recourse. The notes were subsequently revised to make a portion of the note recourse or to increase petitioner's recourse liability. No consideration was given to petitioner for the increase in recourse liability. Furthermore, the amount of increase corresponded to the amount petitioner needed for maximum tax benefits. The dealings between petitioner and Jackie were not businesslike and did not indicate a profit objective on the part of petitioner in the purchase of the art masters. The manner by which Mr. Rothschild and Mr. Rose arrived at the values they put on the art masters was not explained. Their values assumed the ability of investors to immediately sell millions of items. It is clear from this record that such a *176 volume of sales was improbable. Also, no consideration was given in the appraisals to the prices or fair market values of such quantity sales. See Skripak v. Commissioner, 84 T.C. 285, 324-325 (1985). Petitioner did not establish that sales could be achieved in the volume necessary to produce any profit. Also, no consideration was given to the effect on potential sales of the marketing of comparable products in comparable volume from other packages sold by Jackie about the time of or prior to petitioner's acquisition. See Skripak v. Commissioner, supra.
Respondent presented expert testimony from Ms. Karen Carolan and Mr. Larom Munson. Ms. Carolan received undergraduate and master's degrees in art history and developed expertise in late 19th century and 20th century art. She has served for over 12 years as an appraiser for the IRS. She has been chairperson of the Art Print Panel and is chairperson of the Art Advisory Panel. Mr. Munson received an undergraduate degree in art history and is a member of the Art Dealers Association of America, the Art Advisory Panel, and the Art Print Panel. Ms. Carolan testified that an optimistic *177 projection for Dead Giveaway would be sales of 10 to 20 percent of the limited edition with 50-percent appreciation on one-third of sales. She projected that even a sale of the entire limited edition would only yield $ 30,187.50. She projected sales of only 5 to 10 percent for Dreams of El Dorado. She projected that even a sale of the entire limited edition would only yield $ 38,062. Ms. Carolan testified that an optimistic expectation for Freighter would have been 10 to 20 percent sales of the limited edition. She projected that even a sale of the entire limited edition would only yield $ 45,938. Mr. Munson testified that a realistic estimate of sales potential with a good marketing effort would have been for limited edition sales of 20 percent of the Dreams of El Dorado prints, 15 to 17 percent of Freighter, and 5 percent of Dead Giveaway. Mr. Munson concluded that the limited editions would have a value of $ 3,250 for Dreams of El Dorado, $ 3,000 for Freighter, and $ 500 for Dead Giveaway. Ms. Carolan and Mr. Munson agreed that there was little chance that either posters or other ancillary products of the art masters would ever sell successfully. We find no reason to reach *178 a result other than that reached in Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989), with respect to the fair market value of the art masters. "The actual fair market value of the packages at the time of acquisition would be not more than the then present value of the future stream of income, which was negligible." Rose v. Commissioner, 88 T.C. at 418. The presence of deferred debt that is in substance or in fact not likely to be paid is an indicia of lack of or exaggeration of economic substance. See Rose v. Commissioner, 88 T.C. at 419. The nonrecourse debt in this case was not likely to be paid because the revenues from which it would be paid were not likely to be received. Payment of the face amount of the recourse portions of the deferred notes, whether full or partial, was also unlikely. Petitioner expected that even if the program did not sell many of his limited edition prints, he would be able to avoid liability on the notes by turning back inventory in payment of the entire amount of the notes. Furthermore, Jackie would routinely forgive the recourse liabilities *179 in the contracts if the investors returned the art master and limited edition prints. Apparently no attempt would be made to verify whether the fair market value as determined under the contracts was equal to the outstanding notes. Petitioner himself received such an offer. Without repeating the detailed discussion of the financing in Rose v. Commissioner, supra, we conclude for the same reasons that at the time of the transactions in issue in this case, the face amount of the deferred debt was not reflective of true economic obligations of petitioner. Because we find that the transactions lacked economic substance, the transactions do not give rise to any depreciation deductions, miscellaneous deductions, or investment tax credits. Petitioner argues that because he has a suit pending against Jackie his situation differs from the situation in Rose v. Commissioner, supra, and similar cases. Petitioner never made clear what was involved in his suit, although at times he seemed to suggest that it involved the failure of Jackie to furnish prints of "Dead Giveaway" in accordance with the agreement between the parties. Even if a State court recognized petitioner's *180 agreement with Jackie as being valid for some purposes, which petitioner has not shown to be the fact, it does not cause the transaction to be recognized for tax purposes where it is, as here, without substance and solely for tax avoidance. Respondent argues that petitioner has not shown that either Marketing or Development had any losses for the years here in issue. Respondent does not question that Management would be entitled to its proportionate share of losses of Marketing, if any, to the extent of its unused investment in the partnership. Secs. 701, 702. He does question whether petitioner would be entitled to deduct such losses. Petitioner was the sole shareholder of Management. Petitioner testified that Management filed its corporate tax returns as an S corporation pursuant to the election provided for in sections 1362 through 1378. In general, a corporation that has made such an election is not subject to corporate tax, but rather the corporate income is taxed to the shareholders. Secs. 1363(a), 1366(a). Section 1367 deals with adjustments to the basis of a shareholder's stock. Generally a shareholder cannot deduct losses in excess of his basis in his stock plus *181 corporate indebtedness of the corporation to him or for which he is personally liable. Because petitioner has introduced no evidence as to his adjusted basis or indebtedness of Management to him or for which he is personally liable, it is not possible to determine the amount of loss that petitioner would be entitled to deduct if Management did in fact have a loss from its partnership interest in Marketing. Accordingly, petitioner is not allowed any loss or deduction as a result of his ownership of Management. Petitioner was the initial limited partner at the formation of Marketing, but pursuant to the limited partnership agreement, he was to withdraw as limited partner concurrently with the recordation of an amended certificate which admitted additional limited partners. No Schedule K-1 was issued for petitioner with respect to Marketing during 1980, 1981, or 1982. The Schedules K-1 attached to the partnership return of income filed by Marketing reflect that 100 percent of the partnership interests were held by partners other than petitioner, with no interest being held by petitioner. Petitioner has not shown that he, as an individual, owns an interest in Marketing. Accordingly, *182 he is not entitled, in his individual capacity, to any profit, loss, or deduction from Marketing. Because petitioner has not established an ownership interest in Marketing in his individual capacity or sufficient evidence of his interest in Management to determine the amount of loss or deduction allowable to him from Marketing through Management, we do not consider subsequent issues relating to this partnership. Petitioner was a limited partner in Development. During 1981 he contributed $ 10,000 to its capital and according to the Schedules K-1 attached to Development's returns of income had a 1.86371-percent interest in losses and a 0.9659-percent ownership interest in capital. He made no additional contributions to capital in 1982. Therefore, petitioner had a $ 10,000 basis in the Development partnership because of his capital contribution. Sec. 722. Section 465(a) provides in general that a loss from a business activity is allowed only to the extent of the aggregate amount with respect to which a taxpayer is at risk for the activity. The limitation applies to an activity engaged in by the taxpayer in carrying on a trade or business or for the production of income. Sec. *183 465(c)(3). A taxpayer is considered to be at risk for an activity with respect to the amount of money contributed by the taxpayer to the activity and amounts borrowed for use in the activity to the extent that the taxpayer is personally liable for the repayment of the amount. Sec. 465(b). The marketing agreement between Development and IVR, if any was actually signed, is not in evidence. The proposed agreement attached to the private placement memorandum of Development contains a deferral option for marketing fees. This deferral option was not conditioned upon the partners' assuming personal liability for the payment of marketing fees. Therefore, based on this record we conclude that petitioner is not at risk for any amount beyond his $ 10,000 capital contribution to Development, and his loss, if any, from this partnership is limited accordingly. See sec. 704(d). We will therefore consider respondent's contention that the record fails to show that Development had any loss during the years here in issue. Respondent contends that petitioner has not shown that Development had a loss in either of the years 1981 or 1982. Respondent argues that the major portion of the loss comes *184 from deduction by Development of fees it accrued as due to Management but did not pay to Management and that since there was no intention to pay these fees, it was an improper accrual. Respondent further argues that Development had not actually commenced any business activity in 1981 or 1982 and therefore improperly accrued these management fees as well as the other expenses claimed as deductions by Development. Respondent contends that to the extent any of the amounts were properly accrued by Development they were start-up costs and therefore capital expenditures. For this reason, respondent contends Development had no loss in 1981 or 1982 and petitioner improperly claimed a loss deduction because of his partnership interest in Development. Since we agree with respondent that any fees claimed by Development to be due to Management and accrued in 1981 and 1982, as well as other expenses claimed in those years, were start-up costs which are capital expenses and not deductible business expenses, we need not consider respondent's argument that the management fees were not properly accrued. Section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred *185 during the taxable year in carrying on any trade or business". In order for expenses to be deductible under section 162, the expenses must relate to a trade or business functioning at the time the expenses are incurred. Start-up or pre-opening expenses are not currently deductible under section 162. Richmond Television Corp. v. United States, 345 F.2d 901, 906-907 (4th Cir. 1965), vacated and remanded on another issue 382 U.S. 68 (1965), original holding on this issue reaffd. 354 F.2d 410, 411 (4th Cir. 1965); Hardy v. Commissioner, 93 T.C. 684, 687 (1989), affd. on this issue, rem. on another issue in an unpublished order (10th Cir. Oct. 29, 1990). See Hardy v. Commissioner, T.C. Memo. 1991-187. This has been referred to as the "pre-opening expense doctrine". Id. at 688. The costs of starting up a new trade or business or a new income-producing activity are inherently capital because they are expenses of creating or acquiring a capital asset. See Commissioner v. Idaho Power Co., 418 U.S. 1, 12 (1974)
Respondent argues that the marketing and management fees *186 and other expenses claimed to be accrued by Development are not deductible because Development was not carrying on a trade or business. In support of this, he argues that Development never reached an operational stage where expenses could be currently deducted. A taxpayer is not engaged in carrying on any trade or business within the meaning of section 162 until such time as the business begins to function as a going concern and performs those activities for which it was organized. Development was organized to engage in the development and marketing of timeshare intervals and in connection therewith to acquire, invest in, own, maintain and improve real property and to create and market timeshare intervals therein. Even though the organizers of Development had decided for Development to enter into the timeshare business and over a period of time spent money in preparation for entering that business, it had not begun to function as a going concern and perform the activities for which it was organized. The partnership return of income for the 1981 calendar year reflected that the year began on December 30, 1981, and ended one day later on December 31, 1981. During this time period, *187 Development did not own any property on which it could offer timeshares. Furthermore, it had no clients interested in purchasing timeshares. At the most, at the end of the 1981 calendar year Development merely had an outline for forming a business. Accordingly, the marketing fees and other expenses incurred in 1981 are capital expenses. At the end of the 1982 calendar year, Development was still in its formative stages. At most, it had attempted to locate timeshare participants and suitable timeshare property, but had not actually done so. There was no certainty that Development would obtain property or that timeshares would be sold. At the end of the 1982 calendar year, Development had acquired an option on a boat named White Peppa for $ 17,090, a creditor interest of $ 1,005,000 in a boat named Romance, and made a $ 120,623 downpayment on a boat to be built named Skipperliner. Development could not be considered to have begun its business until suitable property was purchased and timeshare intervals were being held for sale. See Goodwin v. Commissioner, 75 T.C. 424, 433 (1980), affd. without published opinion 691 F.2d 490 (3d Cir. 1982). *188 Accordingly, the management and marketing fees and other expenses incurred in 1982 are not current expenses and must be capitalized. Therefore, Development had no loss in 1981 or 1982 for petitioner to deduct. Section 6659(a) provides for an addition to tax for underpayment of tax attributable to valuation overstatements for returns filed after December 31, 1981. Pursuant to section 6659(c) a valuation overstatement occurs if the adjusted basis of any property claimed on any return is 150 percent or more of the amount determined to be correct for such adjusted basis. Respondent affirmatively alleged his claims for the addition to tax for a valuation overstatement by an amendment to answer and, therefore, has the burden of proof on this issue. In this case it is necessary for respondent to show that Development had a valuation overstatement on "any" return filed by petitioner after 1981 for the years here in issue. Zirker v. Commissioner, 87 T.C. 970, 979-982 (1986); Nielsen v. Commissioner, 87 T.C. 779, 782 (1986). First, we note that respondent has not shown a valuation overstatement on petitioner's 1979 return. The original Form 1040 *189 submitted by petitioner for 1979 was not a return since it was not signed. The Form 1040X filed by petitioner for the year 1979 in April 1989 did not show a valuation for petitioner's Jackie art masters, and there is no indication that any valuations of these items in other years in any way affected petitioner's 1979 tax liability. Therefore, respondent has not carried his burden of proof for 1979. We have found that the transactions between petitioner and Jackie lacked economic substance and should not be recognized for tax purposes. Therefore, petitioner's basis in the Jackie art masters for purposes of depreciation or investment tax credit is zero. See Zirker v. Commissioner, supra at 978-980. For the years 1980, 1981, 1982, and 1983, the returns filed by petitioner showed valuations of Jackie art masters as set forth in our findings. It follows that the adjusted basis claimed on the tax returns filed in 1988 and 1989 for the years 1980, 1981, 1982, and 1983 exceeded 250 percent of the correct adjusted basis. Therefore an addition to tax equal to 30 percent of the underpayment attributable to the valuation of the art masters is appropriate with respect *190 to the claimed depreciation and investment credits, if the returns for the years here in issue filed in 1988 and 1989 after the issuance of the notice of deficiency are considered returns for purposes of section 6659(a). In Phillips v. Commissioner, 86 T.C. 433 (1986), affd. on this issue 851 F.2d 1492 (D.C. Cir. 1988), we held that a joint return filed after the mailing of the notice of deficiency and the filing of a petition with this Court was to be recognized as a joint return for purposes of the rate schedule to be used in computing a taxpayer's income tax where no previous separate returns had been filed. Here the parties in the stipulation of settled issues have stipulated that petitioner is entitled to have his income tax for each year computed on the basis of filing a joint return, which is in accordance with the holding in Phillips. In Hesselink v. Commissioner, 97 T.C. 94 (1991), we held that in computing the amount of the understatement to which section 6661 applies, a return filed after respondent commenced an investigation of a taxpayer's tax liability was not to be used to determine the amount of the understatement *191 where no prior return had been filed. Under the circumstances the addition was to be computed using zero as the amount of tax shown on the taxpayer's return. Our holding was based on approval of income tax regulations so determining. We did not refuse to recognize the late filed return as a return, but would not consider it for purposes of section 6661, because of provisions of the regulations. There are no income tax regulations with respect to section 6659 similar to those relating to section 6661 discussed in Hesselink v. Commissioner, supra.We therefore conclude that the returns filed by petitioner in 1988 and 1989 for the years 1980 through 1983 are to be used in determining the amount of petitioner's valuation overstatements of Jackie art masters for the purposes of section 6659. Section 6621(c) provides for an increased rate of interest on underpayments attributable to tax-motivated transactions, including "any valuation overstatement (within the meaning of section 6659(c))" and "any sham or fraudulent transaction". Sec. 6621(c)(3)(A)(i) and (v). Respondent in his amendment to answer claimed increased interest under section 6621(c) with respect *192 to the amount of the deficiency in each year that results from adjustments on the Jackie art masters and the losses claimed on the Resort Timeshares partnerships. We hold that the provisions of section 6621(c) are designed for and applicable to transactions such as petitioner's dealings with Jackie. See Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989). We therefore sustain respondent's claimed increased interest under section 6621(c) as to an underpayment applicable to the disallowance of deductions claimed as to Jackie art masters. While we have found that petitioner has not shown that he is entitled to the partnership losses claimed in connection with the Resort Timeshares partnerships, respondent has not shown that these activities were tax motivated, and respondent therefore has failed to carry his burden of proof as to the section 6621(c) increased interest with respect to the underpayment due to this activity. Section 6661(a) imposes an addition to tax if there is a substantial understatement of income tax for any taxable year. In general, substantial understatement is defined as the excess of (1) the amount *193 of tax required to be shown on the return for the taxable year, over (2) the amount of the tax imposed which is shown on the return, reduced by any rebate. Sec. 6661(b)(2)(A). Section 1.6661-2(d)(2), Income Tax Regs., provides: (2) Tax shown on return. For purposes of section 6661, the amount of tax shown on the return for the taxable year is determined * * * without regard to any amount of additional tax shown on a return (including an amended return, so-called) filed after the taxpayer is first contacted by the Internal Revenue Service concerning the tax liability of the taxpayer for the taxable year. * * * If no return was filed for the taxable year or if the return (other than a return filed under section 6014) shows no tax due, the amount of tax shown on the return is considered to be zero. * * *
In construing this code provision and regulation, we have held that when a taxpayer files an income tax return after being contacted by the IRS, the amount of tax shown on the return is "additional" to the zero amount prior to contact. In reaching this result, we noted that section 6661 was enacted in 1982 to enhance taxpayer compliance and deter taxpayer participation *194 in the "audit lottery" whereby taxpayers take questionable positions on their tax returns in the hope that they will not be audited. Estate of McClanahan v. Commissioner, 95 T.C. 98, 103-104 (1990); S. Rept. 97-494 at 272 (1982). We concluded that a taxpayer who fails to file a return until after he is contacted by the IRS is as much a participant in the audit lottery as a taxpayer who submits a timely return containing highly questionable positions. Hesselink v. Commissioner, 97 T.C. 94 (1991); Estate of McClanahan v. Commissioner, supra at 104. Specifically, the "amount of the tax imposed which is shown on the return" does not include any tax shown on a return filed after contact by the IRS. Hesselink v. Commissioner, 97 T.C. at 96 n.3. We sustain respondent's determination of the addition to tax under section 6661 except that under section 6661(a)(3) in determining the amount of the addition "there shall not be taken into account that portion of the substantial understatement in which a penalty is imposed under section 6659" relative to the valuation overstatement. An addition to tax is imposed *195 by section 6651(a)(1) for failure to timely file a return, unless the taxpayer establishes that the failure was due to reasonable cause and not to willful neglect. The addition is equal to 5 percent of the tax required to be shown on the return, with an additional 5 percent for each month or fraction of a month that the failure to file the return continues, up to a maximum of 25 percent. The burden of showing reasonable cause rests with petitioner. Rule 142(a). Respondent contends that petitioner is liable for the addition to tax under section 6651(a)(1) for each of the years 1979 through 1983. While we do not accept petitioner's contention that he believed that he was not required to file a return, such a belief, if shown, would be insufficient to show that the failure to file was due to reasonable cause. Lawrence Block Co. v. Commissioner, 12 T.C. 366 (1949); P. Dougherty Co. v. Commissioner, 5 T.C. 791, 800 (1945), affd. 159 F.2d 269 (4th Cir. 1946). Petitioner has failed to show that his failure to timely file his returns for each year here in issue was due to reasonable cause and not to willful neglect. Petitioner's *196 main argument is that "someone" in the IRS told him he did not have to file a return if he had no income. Again, if petitioner had established this claim, such a general statement by some IRS employee would not be reasonable cause for failure to file. We sustain respondent's determination of the addition to tax under section 6651(a)(1). Section 6653(a) for taxable years 1979 and 1980 and section 6653(a)(1) for taxable years 1981, 1982, and 1983 provide for an addition to tax if any part of the deficiency is due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) provides for an additional addition to tax equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence with respect to returns filed after 1981. Negligence is the lack of due care, or the failure to do what a prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent contends that petitioner is liable for the addition to tax for negligence for each of the years 1979 through 1983. Petitioner has not shown that the underpayment or any part of the underpayment was not due to negligence *197 or intentional disregard of rules and regulations. We therefore sustain respondent's determination of additions to tax under section 6653(a), (a)(1) and (2) for the years in issue. Section 6654(a) provides for an addition to tax for underpayment of estimated tax by a taxpayer. Petitioner had tax liabilities with respect to each of the years 1979 through 1983, but failed to make estimated payments of his tax liability. Petitioner has failed to establish that he comes within any of the exceptions set forth in section 6654(d) exempting him from this addition to tax. Reaver v. Commissioner, 42 T.C. 72, 83 (1964). We sustain respondent's determination of additions to tax pursuant to section 6654(a) for each of the years in issue. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. See Gangel v. Commissioner, T.C. Memo. 1991-358; Mandelbaum v. Commissioner, T.C. Memo. 1990-223; Ballard v. Commissioner, T.C. Memo. 1988-436; Estate of Murray v. Commissioner, T.C. Memo. 1987-602↩.